FOR PUBLICATION



**FILED**
May 20 2014, 9:22 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS:

**KAREN M. HEARD**
Vanderburgh County Public
Defender's Office
Evansville, Indiana

ATTORNEY FOR APPELLEES:

**JULIANNE L. FOX**
Fox & Lutz, LLC
Evansville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE ADOPTION OF J.M.: | ) ) ) |
| J.P. AND J.M., | ) ) |
| Appellants-Natural Parents, | ) ) |
| vs. | )  No.  82A01-1309-AD-404 |
| | ) |
| R.H. AND R.H., | ) ) |
| Appellees-Foster Parents. | ) |

APPEAL FROM THE VANDERBURGH SUPERIOR COURT
The Honorable Brett Niemeier, Judge
The Honorable Jill R. Marcrum, Special Judge
Cause Nos. 82D07-1111-AD-171 and 82D07-1201-AD-10

**May 20, 2014**

**OPINION – FOR PUBLICATION**

**BAKER, Judge**

In this case, appellants-natural parents Mother and Father (collectively, "the Natural Parents") had a relationship that was plagued by substance abuse and domestic violence when JM was born in December 2009. The Indiana Department of Child Services (DCS) removed JM from the Natural Parents when she was only a few months old.

JM was placed in foster care. Eventually, the DCS filed a petition to terminate parental rights. While that petition was pending, JM's foster parents (Foster Parents) filed a petition to adopt her. Several months later, JM's paternal grandparents (Grandparents), filed a competing petition to adopt JM, and the Natural Parents consented to Grandparents adopting JM.

The trial court determined that in light of the competing adoption petitions, a consent hearing was necessary. Following a hearing, the trial court determined that the Natural Parents were unfit and that their consent was unnecessary. After a change of judge, an adoption proceeding was held, and the trial court granted the Foster Parents' petition to adopt JM, emphasizing that because of a post-adoption agreement, the Grandparents would remain a part of JM's life.

The Natural Parents appeal the trial court's determination that their consent was unnecessary and that it was in JM's best interest to dispense with their consent. Concluding that the trial court did not err by dispensing with the Natural Parents' consent

and refusing to hear additional evidence on the issue during the adoption proceeding, we affirm the judgment of the trial court.

FACTS

JM was born on December 23, 2009, to Mother and Father. At the time of her birth, JM was the youngest of four children born to Mother and the younger of two children born to Father. Father's oldest child lives with his biological mother in Evansville.

On April 20, 2010, the DCS removed JM and her three siblings from the Natural Parents because of their alcoholism and drug use, the conditions in the home, the children's school absences, and domestic violence. At that time, Father was incarcerated in the Indiana Department of Correction (DOC). The four children were found to be Children in Need of Services (CHINS) and placed in foster care with the Foster Parents; family members did not request placement until after petitions to terminate parental rights had been filed.

A disposition hearing was held on June 9, 2010, and Mother's parental participation plan was ordered. Three months later, when father was released from the DOC, his parental participation plan was ordered.

Although the Natural Parents had severe parenting issues, they did show progress. Nevertheless, the DCS filed Informations for Contempt on the Natural Parents for failure to comply with services. Specifically, Mother failed at least two different drug and alcohol treatment programs. Mother consumed alcohol when she had the children during

3

the eleven-day trial home visit in August 2011, and she had alcohol in her home at the time of the consent hearing. Mother was on probation for driving while intoxicated at the time of the consent hearing.

Father was on probation during the pendency of the CHINS proceeding. Father continued to use alcohol and drugs during the pendency of the case. Father denied having an alcohol problem at the consent hearing, even though his criminal history is evidence of it.

Domestic violence was also an issue throughout the case; at least two DCS caseworkers observed bruising on Mother. The DCS was prepared to do a trial home visit but did not proceed because Mother appeared in court with unexplained bruises. Mother and Father were ordered to attend domestic violence classes but failed to attend. Mother and Father requested an opportunity to attend couples therapy but neglected to complete it. The eldest child in the household exhibited anger issues from witnessing the violence that had occurred in the home and needed therapy to overcome the issues associated with living in that environment.

Throughout the CHINS proceeding, housing was an issue. At the time of the consent hearing, Mother and Father were residing in a home provided by Father's father.

The DCS continued to work with the family until it filed its petition to terminate parental rights in August 2011, after the eleven-day trial home visit had failed. Relatives of Mother's three older children filed petitions for guardianship over those children. The

4

Grandparents filed a petition for guardianship of JM. The Natural Parents consented to all guardianships.

The Foster Parents, with whom all of the children had been living in foster care, did not object to the guardianships of the older children, and the guardianships of the three older children were granted. The three older children went to live with their relatives.

The Grandparents requested placement of JM pending their guardianship hearing, and the Foster Parents objected. The Foster Parents then filed a petition to adopt JM on November 1, 2011. The Grandparents filed a competing petition to adopt JM on January 24, 2012, and parental consents soon followed.

The Natural Parents received notices of adoption in open court on November 15, 2011. Father timely filed a notice to contest the adoption on December 15, 2011, but Mother did not file a notice to contest until May 30, 2012.

Because the Foster Parents did not have signed parental consents, they requested a consent hearing; the Grandparents filed a memorandum of law in opposition. After hearing arguments, the trial court ordered a consent hearing to determine whether parental consent was necessary before proceeding to the contested adoption hearing.

The consent hearing was held over the course of three days: June 26, 2012, July 3, 2012, and July 12, 2012. The Grandparents and their attorney were not permitted to be present at the consent hearing. Following the consent hearing, the trial court concluded that "the parents are unfit and the adoption would serve the children's best interests."

5

Appellant's App. p. 92. Accordingly, the trial court determined that the Natural Parents' consent was unnecessary.

The Grandparents moved for a change to a special judge. The trial court granted the request over the Foster Parents' objection. Through a process of striking the names of proposed judicial officers, the parties chose Vanderburgh County Magistrate Jill R. Marcum to act as special judge during the adoption proceeding.

The adoption hearing on the competing petitions commenced on April 9, 2013. The trial court permitted the Natural Parents to intervene over the Foster Parents' objection by allowing their attorney to participate in the hearing.

The Guardian Ad Litem (GAL) and Court Appointed Special Advocate (CASA) recommended that the Grandparents be permitted to adopt the child. The DCS filed consents for the Grandparents and the Foster Parents. The hearing on the competing adoption petitions ended on April 12, 2013.

On August 28, 2013, the trial court issued its order and its amended order, granting the Foster Parents' petition and denying the Grandparents' petition. The trial court found, in part:

> 23. Based upon the evidence presented, both parties are appropriate to care for [JM]. Both parties appear to have stable relationships and are appropriate to be adoptive parents. All of the parties love [JM] and appear to want the best for her. [JM]'s life appears to be stable and full of love. It is unfortunate that the circumstances of her parents left her in the current situation.
>
> . . .

6

26. In [JM]'s world, the [Foster Parents] are her parents and the [Grandparents] are her grandparents. [JM] has lived three years with the [Foster Parents]. She has been a part of their family while also having the love and support of the [Grandparents] as grandparents. To grant the [Grandparents] petition would rip [JM] from the only life she can remember. While biological family is important, the best interests of [JM] require that she not be torn from the only family unit that she can remember. To grant the [Grandparents]' request would shift the Grandparents from being [JM]'s grandparents to being her parents. The [Foster Parents] would suddenly just be friends of the family.

27. Both parties have filed post-adoptive agreements. The post-adoptive agreement will ensure that [JM] continues to have a relationship with the Grandparents and that the bond they have formed will continue.

Appellant's App. p. 96.

The Grandparents did not appeal the trial court's decision, denying their petition to adopt JM. The Natural Parents now appeal the trial court's decision that their consent was unnecessary.

DISCUSSION AND DECISION

I. Standard of Review

The Natural Parents assert three arguments on appeal: (1) the trial court erred when it held a consent hearing and extinguished their rights to parental consent; (2) the trial court erred when it refused to hear any evidence as to whether the adoption placement selected by the Natural Parents through their consents was in JM's best interests; and (3) both trial courts erred when they failed to properly consider the Natural Parents' fitness at the time of the hearings.

7

Here, the trial court entered findings of fact and conclusions of law. Thus, we determine whether the evidence supports the findings and whether the findings support the judgment. In re Adoption of K.F., 935 N.E.2d 282, 287 (Ind. Ct. App. 2010). A trial court's findings and judgment will be left undisturbed unless they are clearly erroneous. Id. Findings of fact are clearly erroneous when the record lacks any direct evidence or reasonable inferences to support them. Id. A trial court's judgment is clearly erroneous when it is unsupported by the findings and conclusions. Id.

The adoption statutes created a proceeding that was unknown at common law. In re Adoption of B.W., 908 N.E.2d 586, 592 (Ind. 2009). Therefore, they must be strictly construed, preserving the rights of natural parents, while protecting children from instability and uncertainty. Id. at 592, 594.

## II. Necessity of Consent Hearing

The Natural Parents argue that the trial court erred by conducting a consent hearing, insofar as they had already consented to the Grandparents adopting JM. Generally, parental consent is required before a child under the age of eighteen may be adopted; however, there are some exceptions. In re Adoption of A.S., 912 N.E.2d 840, 848-49 (Ind. Ct. App. 2009). For instance, Indiana Code section 31-19-9-8(a)(11) provides:

> Consent to adoption, which may be required under section 1 of this chapter, is not required from any of the following:
> . . .

8

A parent if:

(A) a petitioner for adoption proves by clear and convincing evidence that the parent is unfit to be a parent; and

(B) the best interests of the child sought to be adopted would be served if the court dispensed with the parent's consent.

Here, on November 1, 2011, the Foster Parents filed a petition to adopt JM, stating that "consent of the parents should not be required as Mother and Father have termination of parental rights trials on November 29, 2011." Appellants' App. p. 27-28. Thus, the necessity of parental consent was at issue from the moment the first petition to adopt JM was filed. Then, a few months later, the Grandparents filed their petition to adopt JM, and parental consents followed. Id. at 30-33, 35-36.

Under these circumstances, a consent hearing was necessary before the trial court could procedurally address the competing adoption petitions. Indeed, the consent hearing was akin to the termination of parental rights proceeding that was on hold, pending the outcome of the adoption proceedings.

### III. The Child's Best Interests

The Natural Parents argue that the trial court erred when it failed to determine whether their prior consents were in JM's best interests. However, Indiana Code section 31-19-9-8(a)(11)(B) provides that the trial court determine whether "the best interests of the child sought to be adopted would be served if the court dispensed with the parent's consent." Accordingly, the trial court was not required to determine whether the Natural Parents' prior consents were in JM's best interests.

9

That said, the trial court found that the "parents are unfit to be parents and the best interest of the child would be served if the Court finds that the parents' consent should be dispensed with." Appellants' App. p. 90. Thus, the trial court did make a finding regarding JM's best interests as it pertained to dispensing with the Natural Parents' consent, and this argument fails.

### IV. Parental Fitness at the Time of Hearings

Finally, the Natural Parents argue that the trial court erred by not considering their fitness at the time of the hearings. More particularly, they contend that the trial court should have considered their fitness at the time of the consent hearing and again at that the adoption hearing.

In re K.F., 935 N.E.2d 282 (Ind. Ct. App. 2010), is instructive. In that case, father and stepmother had physical custody of the children, and mother was granted supervised visitation because of her serious drug addiction. Id. at 283. Mother failed one drug screen in 2007 and two in 2008. Id. In May 2008, stepmother filed a petition to adopt the children. Id. In April 2009, mother was arrested for dealing in heroin and was four months pregnant, but was unaware that she was pregnant. Id. Mother failed another drug screen in 2010 and admitted to taking Percocet and snorting heroin. Id. at 284.

The trial court observed that "Indiana courts have found parents unfit due to drug abuse." Id. at 287. Additionally, the trial court, citing mother's "historical inability and difficulty staying off drugs even while this adoption proceeding was pending," found mother to be an unfit parent and that it would be in the best interests of the children that

10

her rights be terminated and that the adoption be granted.  Id.  On appeal, a panel of this Court affirmed, reasoning that mother had been battling a serious substance abuse problem and that this was sufficient to prove that she is unfit to be a parent.  Id. at 289.

Here, the record indicates that the DCS removed four-month-old JM and her three siblings from the home because of, among other things, the Natural Parents' alcoholism, drug use, and domestic violence.  Pet. Ex. 11a, Ex. vol. 1.[1]  At that time, Father was incarcerated.  JM was found to be a CHINS, and she was placed with the Foster Parents.  Id.

Moreover, the DCS filed Informations for Contempt on the Natural Parents for failure to comply with services.  Specifically, Mother missed drug screens on December 6 and 7, 2010; January 10, 24, 25, and 31, 2011; February 1, 2, 7, 8, and 9, 2011; and August 4, 7, and 15, 2011.  On March 6, 2011, her results were "[p]ositive alcohol 10,000" and on March 11, 2011, her results were "[p]ositive alcohol 1098."  Id.  She failed to complete treatment and was discharged on August 12, 2011.  Id.  Similarly, Father was ordered to remain drug free but "[h]ad a positive ETG on 04/18/2011 with a value of 10,000."  Id.

In August 2011, Mother consumed alcohol during an eleven-day trial visit with the children.  Appellants' App. p. 86.  And although Mother completed court-ordered treatment in May 2012, she keeps alcohol at her residence.  Id.  Father continues to drink on occasion, particularly holidays, even though he has a history of alcohol-related crimes.

---

[1] Because of the voluminous record in this case, particularly exhibits, we will refer to the volume in which a particular exhibit is located.

Id. at 85. In light of the Natural Parents' historical difficulty with alcohol and lack of insight into the negative effects that alcohol has had on their lives, we cannot say that the trial court erred by concluding that they were unfit at the consent hearing.

As for the adoption hearing, the Natural Parents' argument that the trial court should have reevaluated their fitness at that time is merely a request for a second bite at the proverbial apple. Once the trial court concluded that the Natural Parents were unfit at the consent hearing, as stated above, the effect was the termination of their parental rights.

Notwithstanding this fact, we observe that in many adoption cases, the result is not only the termination of parental rights, but also the severance from a family tree; however, that did not happen in the instant case. Indeed, because of the post-adoption agreements, the Grandparents will continue to be JM's grandparents. Appellants' App. p. 96. JM will not be severed from her family tree of birth, but rather, will enjoy the love and nurturing that grandparents give so freely. We encourage these agreements, where appropriate, for the benefit of children.

The judgment of the trial court is affirmed.

BARNES, J., and CRONE, J., concur.

12