Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 11 2014, 7:05 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**FREDERICK A. TURNER**
Bloomington, Indiana

ATTORNEY FOR APPELLEE:

**KENDRA G. GJERDINGEN**
Mallor Grodner LLP
Bloomington, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE ADOPTION OF        )
D.M.B.                                  )
                                        )
D.P.B. (Father),                        )
                                        )
    Appellant- Respondent,              )
                                        )
              vs.        )        No. 53A01-1312-AD-547
                                        )
T.M.N. (Stepfather),                    )
                                        )
    Appellee- Petitioner.               )

APPEAL FROM THE MONROE CIRCUIT COURT
The Honorable Stephen R. Galvin, Judge
Cause No. 53C07-1301-AD-2

**July 11, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

D.P.B. ("Father") and L.H.N. ("Mother") are the biological parents of D.M.B. Mother and Father separated. Mother married T.M.N. ("Stepfather"), who petitioned to adopt D.M.B., which Father contested. After a hearing, the trial court issued an order granting Stepfather's petition and concluding that Father's consent was not required. On appeal, Father argues that the trial court erred in so concluding. We affirm.

**Facts and Procedural History**

The trial court's order contains the following factual findings:

1. [Mother] was born in Vietnam. She was adopted by United States citizens as a child. She graduated from Bloomington South High School in 2008.

2. [Father] was incarcerated for Robbery in 2008.

3. [D.M.B.] was born September 14, 2009, to [Mother] and [Father]. [D.M.B.] was born in Bloomington Hospital. [Father] was present at her birth.

4. [Mother] and [Father] were living together in Indianapolis, Indiana at the time of the birth. [Mother] was attending I.U.P.U.I. and working to help support the family. [Father] worked as a tattoo artist, earning approximately $13,000 in cash in 2009. He also obtained a student loan for $7000. [Father] dropped out of school. He did not pay income tax on his earnings.

5. [Father] contributed nothing for the rent and utilities. [Mother's] parents paid the rent. [Father] did not pay for food, diapers, or cloth[e]s for [D.M.B.] He did not pay for medical care or daycare. He contributed nothing for the care and support of [D.M.B.], although he had means to do so.

6. After [D.M.B.] was born, [Father] took $500 from [Mother's] bank account without her permission.

2

7. In October, 2009, [Father] battered [Mother] during an argument over [his] infidelity. [Father] struck [Mother] in the face, dislocating her jaw. [D.M.B.] was present. [Mother] went to the hospital. [Father] was apologetic. The battery was never reported to the police.

8. In January, 2010, [Mother] and [D.M.B.] moved to her [parents'] home in Bloomington, Indiana. After a brief stay with her parents, they moved to Canterbury Apartments in Bloomington. [Father] stayed in Indianapolis. At this time, [Father] would visit periodically, but did not keep the child overnight. He would help with child care when he visited. He paid no support.

9. [Mother] allowed [Father] to have [D.M.B.] for four days in March, 2010. When [Father] returned [D.M.B.], she was suffering from severe diaper rash. [Mother] took the child to the doctor for treatment.

10. In June, 2010, [Father] came to [Mother's] home in the middle of the night. An altercation ensued. [Father] admits that he slapped [Mother] during the fight. Again, he dislocated her jaw. He would not allow her to call the police. He was arrested and charged with Criminal Confinement, a class D felony; Domestic Battery, a class A misdemeanor; and Interference with the Reporting of a Crime, a class A misdemeanor.

11. [Mother] continued to allow [Father] to see [D.M.B.] [Father] told [Mother] that he had changed. She believed him. She bailed [Father] out of jail.

12. On September 29, 2010, [Father] plead guilty to Domestic Battery and Interference with the Reporting of a Crime. He was sentenced to 58 days in jail, with credit for time served.

13. In November, 2010, [Mother] and [Father] made arrangements to meet at his apartment. [Father] did not appear at the appointed time. At 3:30 AM, [Mother] drove to a local bar to find [Father]. [D.M.B.] was in the back seat of her vehicle. [Father] was intoxicated when she found him. He became upset, punching the car window with his fist and shattering the glass. The police were called.

14. In August, 2010, [Mother] and [D.M.B.] moved to Colonial Crest Apartments in Bloomington. [Mother] returned to Bloomington around this time. [Father] had his first overnight visit with the child in 2010.

3

He provided child care for the child on Tuesdays and Thursdays. He had approximately five overnights with [D.M.B.]

15. On December, 16, 2010, [Father] severely battered [Mother]. [Mother] had taken [D.M.B.] to [Father's] apartment for a visit. When she found that he had another woman at the apartment, she became angry. She tried to confront the other woman. [Father] took [D.M.B.] from her. He struck [Mother] in the face, again dislocating her jaw. He pushed her down the stairs. He severely beat her on the legs with a broom. The photographs introduced at the hearing provide graphic evidence of the nature and extent of the beating.

16. [Father] testified that he did not strike [Mother]. Rather, he states that he put her in a headlock to calm her down. The Court does not accept this testimony as truthful.

17. At first, [Mother] was afraid to tell anyone about the beating. After approximately one week, she reported the battery to the Bloomington Police. A warrant was issued for [Father's] arrest.

18. To avoid arrest, [Father] went into hiding.

19. On May 11, 2011, [Father] was arrested. He has been incarcerated since his arrest.

20. Following [Father's] arrest, [Mother] received insulting and threatening text messages from [Father's] brother. The text messages refer to [Mother] as a "bitch" and a "piece of shit." They advise her to "go back to Vietnam."

21. On December 15, 2011, [Father] plead guilty to *Battery Committed by Means of a Deadly Weapon Resulting in Serious Bodily Injury*, a class C felony. He was also found to be a *Habitual Offender*. He was sentenced to 2 years for Battery, and 4 years as a Habitual Offender. The sentences were ordered to run consecutively. [Father] is scheduled to be released on October 5, 2014.

22. [Father] was ordered to have no contact with [Mother]. However, he lost good time credit for violating this protective order during his incarceration.

4

23. [Father] is not remorseful for his repeated acts of domestic violence. He blames [Mother] for causing fights between them. He states that he was only protecting himself.

24. [Father] testified that [D.M.B.] was his "best friend" prior to his incarceration. He testified that he was a good father. He testified that he paid for diapers, formula, cloth[e]s, and a portion of the rent while living with [Mother]. The Court does not accept these statements as truthful.

25. [Father] has another child, [G.L.], born December 28, 2009. He does not pay support for this child. Paternity for this child has never been established. Although the child's mother reports that [Father] is a "loving" father to [G.L.], she never left the child in his care for more than two hours.

26. [Mother] did not take [D.M.B.] to see [Father] in prison. She would not have allowed anyone to take the child to see him. [Father] did not seek an order for parenting time.

27. [Mother] and [Stepfather] began dating in December, 2011. They were married on January 5, 2013.

28. [Stepfather] is the father figure in [D.M.B.'s] life. [Stepfather] treats [D.M.B.] as he would his own child. Indeed, he considers [D.M.B.] to be his child. [D.M.B.] looks to [Stepfather] as her father. She calls him "Dad." To [D.M.B.], he is a caring, loving father.

29. [Stepfather] is 26 years of age. He has three children, ages 6, 4, and 1. He has joint legal custody of these children. He sees the children regularly. He pays support for these children. [D.M.B.] has a relationship with these children.

30. [D.M.B.] is also part of [Stepfather's] extended family. This family includes [Stepfather's] mother, stepfather, and sister.

31. In June, 2013, [Mother] and [Stepfather] briefly separated. [Stepfather] stayed with his sister or slept in his car during this time. The couple reconciled within a week. The Guardian ad Litem notes that, despite this single incident of marital discord, [they] have a stable marriage. The maternal grandmother also believes that [their] marriage is stable.

32.     [Mother] and [Stepfather] are now expecting their first child.

33.     [Stepfather] and [Mother] are both employed. Although they still receive some financial assistance from [Mother's] parents, they have the financial resources to care for [D.M.B.]

34.     The Guardian ad Litem found [D.M.B.] to be a happy, healthy child. She is very social and engaging. Her verbal skills are advanced for her age. The Guardian ad Litem believes that it is in [D.M.B.'s] best interest to be adopted by [Stepfather].

Appellant's App. at 8-11.

The trial court also made the following relevant conclusions:

8.      Given his history of violence and his lack of remorse, [Father] will continue to pose a danger to [Mother] on his release from incarceration. Further, his willingness to batter [Mother] in the presence of his daughter poses a danger to the child's emotional well-being. There is no reasonable probability that [Father] will take responsibility for his actions.

9.      [Stepfather] has established, by clear and convincing evidence, that [Father] is an unfit parent.

10.     [Stepfather] and [Mother] have established a safe and stable home for [D.M.B.] The child is thriving in this home. She sees [Stepfather] as her father. [Stepfather] is a loving and caring father figure. Clearly, [D.M.B.'s] best interests are served by dispensing with [Father's] consent for adoption. Further, it is in the best interests of [D.M.B.] that she be adopted by [Stepfather].

11.     Finally, [Stepfather] alleges that [Father] has made only token efforts to support or communicate with [D.M.B.] As previously noted, he has paid no [child] support. He had minimal contact with [D.M.B.] in 2010. From December 16, 2010 until his arrest in May, 2011, [Father] had no contact with the child. Since his incarceration, he did not attempt to seek a court order for parenting time with [D.M.B.] He has not seen his daughter in 2 ½ years. This evidence is sufficient to prove that [Father] has made only token efforts to communicate with [D.M.B.], and that [D.M.B.] should be declared an abandoned child.

6

12. Under any of the theories advanced by [Stepfather], the consent of [Father] to the adoption of [D.M.B.] is not required.

*Id.* at 13-14. Father now appeals.

**Discussion and Decision**

When reviewing adoption proceedings, we presume that the trial court's decision is correct, and the appellant bears the burden of rebutting this presumption. *In re Adoption of J.L.J.*, 4 N.E.3d 1189, 1194 (Ind. Ct. App. 2014), *trans denied.* We generally give considerable deference to the trial court's decision in family law matters, as we recognize that the trial judge is in the best position to judge the facts, determine witness credibility, get a feel for the family dynamics, and get a sense of the parents and their relationship with their children. *MacLafferty v. MacLafferty*, 829 N.E.2d 938, 940 (Ind. 2005). We will not disturb the trial court's ruling "unless the evidence leads to but one conclusion and the trial judge reached an opposite conclusion." *Rust v. Lawson*, 714 N.E.2d 769, 771 (Ind. Ct. App. 1999), *trans denied.* The trial court's findings and judgment will be set aside only if they are clearly erroneous. *K.I. ex rel. J.I. v. J.H.*, 903 N.E.2d 453, 457 (Ind. 2009). A judgment is clearly erroneous when there is no evidence supporting the findings or the findings fail to support the judgment. *Id.* We will neither reweigh the evidence nor assess the credibility of witnesses, and we will examine only the evidence most favorable to the trial court's decision. *In re Adoption of A.M.*, 930 N.E.2d 613, 616 (Ind. Ct. App. 2010).

Stepfather alleged that Father's consent to the adoption was not required pursuant to Indiana Code Section 31-19-9-8, which provides in relevant part as follows:

7

(a) Consent to adoption, which may be required under section 1 of this chapter, is not required from any of the following:

(1) A parent or parents if the child is adjudged to have been abandoned or deserted for at least six (6) months immediately preceding the date of the filing of the petition for adoption.

(2) A parent of a child in the custody of another person if for a period of at least one (1) year the parent:

(A) fails without justifiable cause to communicate significantly with the child when able to do so; or

(B) knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree.

….

(11) A parent if:

(A) a petitioner for adoption proves by clear and convincing evidence that the parent is unfit to be a parent; and

(B) the best interests of the child sought to be adopted would be served if the court dispensed with the parent's consent.

….

(b) If a parent has made only token efforts to support or to communicate with the child the court may declare the child abandoned by the parent.

As the petitioner, Stepfather had the burden of proving by clear and convincing evidence that Father's consent was not required. *In re Adoption of N.W.*, 933 N.E.2d 909, 913 (Ind. Ct. App. 2010), *adopted by* 941 N.E.2d 1042 (Ind. 2011); Ind. Code § 31-19-10-0.5. The provisions of Indiana Code Section 31-19-9-8 are written in the disjunctive; therefore, they each provide independent grounds for dispensing with parental consent. *In re Adoption of M.L.*, 973 N.E.2d 1216, 1222 (Ind. Ct. App. 2012). "Regardless of which

8

provision is relied on, adoption is granted only if it is in the best interests of the child." *Id.* (citing Ind. Code § 31-19-11-1(a)). Stepfather was required to prove that Father's consent was not required pursuant to only one of the paragraphs listed in Indiana Code Section 31-19-9-8. Therefore, we will only address Father's arguments regarding his fitness and D.M.B's best interests under paragraph (11) of the statute.

As for his fitness to be a parent, Father contends that he is a competent parent and that, unlike his relationship with Mother, his relationship with D.M.B. was good. He also contends that the violence against Mother was in self-defense. Here, the trial court found Mother's testimony to be more credible. Father's argument is merely a request to reweigh evidence and judge credibility, which we may not do. As indicated in the findings, Father has shown a history of violence against Mother and a lack of remorse for that violence. Father has been violent with Mother in the presence of D.M.B. The trial court also found that Father poses a danger to Mother upon his release from incarceration. Father not only has an issue with violence but also has a drug and alcohol problem. Father had minimal contact with D.M.B. in 2010 due to his incarceration as a result of battering Mother. Although Father testified that he filed a petition for visitation while incarcerated, we note that there are no details of this within the record and the trial court specifically found that he did not seek an order for parenting time. Based on the foregoing, we do not find the trial court's conclusion that Father is an unfit parent to be clearly erroneous.

We turn then to D.M.B.'s best interests. Father argues that Mother and Stepfather do not provide a stable household. He claims that they have an unstable relationship, infidelity

9

and financial issues, and multiple jobs in different locations. The evidence most favorable to the trial court's order indicates that Mother and Stepfather's current situation is not as troubled as Father makes it seem. Mother and Stepfather were separated for roughly a week due to his infidelity, which has been resolved. Mother and Stepfather have since had a child together and been committed to one another. Currently both Mother and Stepfather have jobs and are able to be financially stable with some help from Mother's family. Unlike Father, Stepfather has no criminal history and is not violent. Stepfather has lived with D.M.B. for half her life and has provided her with a stable, nurturing environment. Stepfather has provided for D.M.B. while Father was incarcerated. Stepfather has a strong bond with D.M.B. and is the father figure in her life. The guardian ad litem stated that it is in D.M.B.'s best interests to be adopted by Stepfather. We find no error in the trial court's conclusion that D.M.B's best interests would be served if the court dispensed with Father's consent. Therefore, we affirm.

Affirmed.

BAKER, J., and BARNES, J., concur.